# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID EARL WILLIAMS,

                           Petitioner,

v.

JEANNE WOODFORD, et al.,

                         Respondents.

No. 2:05-cv-00980-AK

**ORDER**

David Earl Williams, a California state prisoner represented by counsel, seeks a writ of habeas corpus under 28 U.S.C. § 2254.  He was convicted of first-degree murder.  Williams claims ineffective assistance of counsel ("IAC") at trial.

## Background

In his opening statement, Williams's trial counsel repeatedly promised that the jury would hear testimony from three key witnesses.  Transcript of Opening Statements at 10–24.  Ten times he promised that Williams himself would testify.  Twice he promised that Miyaka Oliphant, Williams's then-girlfriend who was with him the entire night of the murder, would testify.  And he also promised that Michael "Freddy" Pollard, who spent much of the same night with Williams,

would testify.  None did.  There were other problems, but they all were connected

to these thirteen promises that the jury would hear from three witnesses, two of

whom the lawyer had never talked to.

## Analysis

**1.**  This court has jurisdiction to consider a petition for a writ of habeas

corpus under 28 U.S.C. § 2254.  Under the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), a writ will not issue unless the state court's

adjudication of petitioner's claim "resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States" or "resulted in a decision

that was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  <u>Id.</u> § 2254(d).

Williams makes his challenge under the latter provision.  Under this circuit's

precedent, "[i]f . . . a state court makes evidentiary findings without holding a

hearing and giving petitioner an opportunity to present evidence, such findings

clearly result in an 'unreasonable determination' of the facts."  <u>Taylor</u> v. <u>Maddox</u>,

366 F.3d 992, 1001 (9th Cir. 2004); <u>see</u> <u>Hurles</u> v. <u>Ryan</u>, 650 F.3d 1301, 1312 (9th

Cir. 2011) ("We have repeatedly held that where a state court makes factual

findings without an evidentiary hearing or other opportunity for the petitioner to present evidence, 'the fact-finding process itself is deficient' and not entitled to deference." (quoting <u>Taylor</u>, 366 F.3d at 1001)).  That's what happened here.

After the verdict, Williams moved for a new trial due to IAC.  He pointed to "[d]efense counsel's opening statement inform[ing] the jury that evidence would be presented through the testimony of David Williams and other witnesses, to show that he was elsewhere when the murder took place."  Memorandum of Nov. 6, 2001, at 1.  Williams argued that defense counsel broke those promises by failing to call Williams and Oliphant as witnesses.  <u>Id.</u> at 6–7.  The Superior Court noted that "the trial, in my opinion, was in the defense's favor all the way up to and into [closing] argument."  Reporter's Transcript at 1281–83.  Nevertheless, it denied the motion, concluding that Williams had shown neither deficient performance nor prejudice.

A new lawyer was then appointed to serve as Williams's appellate counsel. As she explains in her recent declaration, "I decided to renew [the IAC] claim in the direct appeal.  However, I also wished to file a habeas petition raising that claim as I felt that important facts, outside the record, needed to be brought before the court in order to vindicate Mr. Williams' constitutional rights."  Motion for Expansion of the Record ("MER"), Exhibit M.  Because she had been appointed to

handle only the appeal, she sought leave from the Court of Appeal to file a habeas

petition on Williams's behalf, <u>see</u> Request for Authorization To Expand the Scope

of Representation, but the court denied her request without explanation.  Court of

Appeal Order of Aug. 23, 2002; <u>see</u> MER, Exhibit M.

      The lawyer then encouraged Williams to file a habeas petition on his own,

which he did in the Superior Court.  As his "grounds for relief," Williams stated as

follows:  "Petitioner was denied his Sixth Amendment right to effective assistance

of counsel by counsel repeatedly promising the jury that petitioner, his girlfriend,

Miyaka Oliphant, and Michael Pollard would testify and then failing to present any

of those witnesses."  Habeas Petition of Oct. 31, 2002, at 3.1.  By way of evidence,

Williams attached a sworn declaration that included the following:  "I was advised

to not testify by my trial counsel . . . after he had advised the jury that I was going

to testify.  I was going to offer evidence that I was at Wal-Mart when the crime

occurred, and I had witnesses with me while at Wal-Mart. . . .  My counsel's ill

advice contributed to the jury convicting me of the first degree murder charge in

that he violated my constitutional right to effective assistance of trial counsel in

violation [of the] 6th & 14th Amendments to the United States Constitution, and

Article 1, § 15 of [the] California Constitution."  <u>Id.</u> at Exhibit A.  Given that

Williams was incarcerated and forced to proceed pro se, he could not and did not

provide any statement from Oliphant or Pollard.

The same trial judge who had denied Williams's motion for a new trial also considered Williams's habeas petition. He denied the petition in a four-page order, giving Williams no opportunity to supplement the record through discovery or an evidentiary hearing. This appears to have been a consequence of the fact that the court mistakenly believed Williams was raising two distinct IAC claims: a primary claim (in the petition itself) that counsel promised the jury Williams's testimony but failed to deliver; and a secondary and independent claim (in Williams's attached declaration) that counsel advised Williams not to testify after having promised Williams's testimony to the jury.

In truth, Williams presented a single IAC claim: that trial counsel promised the jury that Williams, Oliphant and Pollard would testify, despite having done nothing to secure the testimony of the two other witnesses, and despite working actively to dissuade Williams himself from testifying. Williams's declaration was clearly submitted <u>in support of</u> his one and only IAC claim and was not, as the Superior Court mistakenly believed, a separate, free-standing claim.

The Superior Court refused to consider Williams's declaration in support of his only true claim, explaining that, because Williams's direct appeal was pending, "this court has no jurisdiction at this time to entertain the first claim in this

petition." In re Williams, No. 02F08940 (Cal. Super. Ct. Nov. 18, 2002). Because

Williams's IAC claim now lacked any evidentiary support, the court held that

"petitioner offers nothing new in this petition," whose argument "was raised in

these exact same terms both on the motion for new trial that was denied and on the

appeal." Id.

    In fact, Williams had raised only a single claim: that his lawyer made

promises to the jury before he had ascertained with reasonable certainty who would

testify. The declaration was offered not as an independent claim of incompetence,

but as proof that the lawyer's statement to the jury was premature and reckless.

Williams's petition thus differed from his new trial motion in that it offered

extrinsic facts to support his IAC claim.

    The Superior Court also denied what it viewed as Williams's second IAC

claim "contained in a sworn affidavit from himself that he has attached to the

petition" on the ground that petitioner "fail[ed] to state in his affidavit what his

testimony would have been had he testified at trial." Id. But Williams was not

claiming that his lawyer advised him not to testify even though he had convincing

exculpatory evidence to offer. Rather, his claim was that the attorney promised the

jury that petitioner and two other witnesses would testify, even though he had

taken no steps to secure their testimony and was actively trying to persuade

Williams <u>not</u> to testify.

The judge appears to have overlooked that Williams's IAC claim was also based on his lawyer's unfulfilled promise that Oliphant and Pollard would testify. The judge noted this aspect of Williams's claim in describing the petition but gave no reasons for rejecting it.

Williams's direct appeal was still pending, so he filed a second habeas petition, this time with the Court of Appeal.  Still determined to help Williams expand the record, Williams's appellate counsel "filed a motion to consolidate the pro se habeas petition with the pending appeal."  MER, Exhibit M.  Her motion explained that Williams's habeas "petition includes appellant's declaration . . . stating specifically that his tr[ia]l attorney . . . advised him not to testify.  That is information not included in the record on appeal and is relevant to the ineffective assistance of counsel issue raised in his direct appeal.  Appellant hereby requests this court to consolidate his pro se habeas petition with his direct appeal so that it has the benefit of his declaration in ruling on the ineffective assistance of counsel issue."  Traverse, Exhibit H.  The Court of Appeal denied the motion without explanation.  Court of Appeal Order of Jan. 16, 2003; <u>see</u> MER, Exhibit M.

Having denied Williams's request for consolidation, the Court of Appeal then denied his second habeas petition, with a single sentence by way of

explanation:  "There is an adequate remedy by appeal."  <u>In re Williams</u>,

No. C042775 (Cal. Ct. App. Dec. 12, 2002).  But this was manifestly not true:  On

direct appeal, Williams was limited to the trial record.  And, as the same court

recognized when it eventually ruled in Williams's direct appeal, "'[b]ecause the

appellate record ordinarily does not show the reasons for defense counsel's actions

or omissions, a claim of ineffective assistance of counsel should generally be made

in a petition for writ of habeas corpus, not on appeal.'"  <u>People</u> v. <u>Williams</u>,

No. C039886, 2003 WL 1611428, at *5 (Cal. Ct. App. Mar. 28, 2003)

(unpublished) (quoting <u>People</u> v. <u>Lucero</u>, 3 P.3d 248, 269 (Cal. 2000)).  It was

precisely this gap in the record that Williams was attempting to fill by means of his

second habeas petition.  While the appeal was still pending, Williams filed a third

habeas petition, essentially identical to his first and second petitions, with the

California Supreme Court, which summarily rejected it.  <u>In re Williams</u>, No.

S113540 (Cal. Oct. 15, 2003).

The Court of Appeal rejected Williams's IAC claim on direct appeal, based

largely on Williams's failure to carry his "burden of proving ineffective assistance

of counsel."  <u>Williams</u>, 2003 WL 1611428, at *5 (citing <u>People</u> v. <u>Pope</u>, 590 P.2d

859, 866 (Cal. 1979)).  The court recognized that IAC claims normally should not

be decided on appeal, because they require supplementation of the record, but then

went ahead and decided Williams's IAC claim anyway.  In so doing, it seriously

misapprehended the facts outside the appellate record, no doubt because it had only

the appellate record to work with.

For example, the Court of Appeal described Ouber v. Guarino, 293 F.3d 19

(1st Cir. 2002), as a case where the defendant "'apparently wanted to testify, but

the lawyer [who had promised the jury that she would testify] persuaded her that it

would be in her best interest not to do so.'"  Williams, 2003 WL 1611428, at *6

(quoting Ouber, 293 F.3d at 24, with alteration by the Williams court).  The First

Circuit sustained Ouber's IAC claim, but the Court of Appeal distinguished Ouber

on the ground that, "[h]ere, [defense counsel] did not urge defendant to act

contrary to his promise to the jury.  Rather, defendant chose not to testify after

listening to the prosecution case and after lengthy discussion with [defense

counsel]."  Id.  It's unclear what the Court of Appeal relied on in describing what

transpired between Williams and his lawyer, as there was no evidence about it in

the appellate record.  The court did not mention Williams's declaration, which he

tried to put before the court by moving to consolidate his second habeas petition

with his direct appeal.  In that declaration, Williams explained that his lawyer had,

indeed, persuaded him not to testify, which would have put his case on all fours

with Ouber.

The Court of Appeal was, of course, not required to follow <u>Ouber</u>; it <u>could</u> have concluded that counsel's broken promise that defendant would testify didn't amount to IAC.  Had the Court of Appeal done that, it would be a close and difficult question whether this would be contrary to or an unreasonable application of Supreme Court precedent.  But the Court of Appeal seemed to accept the teaching of <u>Ouber</u> and reached a different result by distinguishing it based on "facts" that were not in the record.  The court made assumptions about facts outside the record without giving petitioner an opportunity to present evidence as to those facts and, indeed, refusing to look at evidence he did present.  This is a textbook case of a defective fact-finding process akin to the type condemned in <u>Taylor</u>, 366 F.3d 992, and <u>Hurles</u>, 650 F.3d 1301.

The Court of Appeal also noted that "[t]he record does not contain Oliphant's statement to the police or her invocation of her right against self-incrimination.  Nor does it show whether [Williams's defense lawyer] knew or should have known, prior to his opening statement, that Oliphant intended to 'stick to' her statement to the police or that she would refuse to testify.  Defendant has the burden of proving that [defense counsel] knew or should have known that Oliphant's testimony would be unavailable, or unhelpful, at the time of opening statements.  He has not met this burden."  <u>Id.</u> at *7.

Given the limited record on appeal, it was plausible for the court to conclude that Williams had not met his burden of showing that his lawyer acted incompetently.  But the court went on to make further assumptions about facts outside the record—facts that are contradicted by the evidence presented in this habeas petition.  For example, the court seems to have assumed that Oliphant's statements to the police were unfavorable to Williams, but those statements were not in the appellate record, as the court recognized, so it's not clear why the court believed them to be unfavorable.  We now have those statements and can see that Oliphant strongly and consistently supported Williams during police investigation.  See pp. 27–35 infra.  The court also seemed to find that Oliphant invoked her right not to testify, even though there is nothing in the record to support this, and we now know it's not true.  Once again, the court made assumptions of fact without giving Williams an opportunity to present evidence, conduct discovery or otherwise develop the record.  This, once again, violated petitioner's right to a fair process for developing the record supporting his claim, in violation of Taylor and Hurles.  Moreover, by adjudicating these extra-record facts against Williams, the Court of Appeal seems to have precluded Williams from disputing these facts in his subsequent habeas petitions, all of which were denied without consideration of Williams's extra-record evidence.  See pp. 12–13 infra.

It is the Court of Appeal's decision on direct review that this court now considers for AEDPA purposes, as both parties agree.  <u>See</u> Supplemental Brief in Support of Petition at 13; Supplemental Answer at 10.  Williams argues that his "claim on appeal was rejected because the record was <u>inadequate</u> to demonstrate the constitutional violation; yet the attempt to demonstrate the constitutional violation via a habeas petition was rejected because the appeal was <u>adequate</u>. Petitioner was both <u>required</u> to expand the record and <u>prohibited</u> from expanding the record."  Supplemental Brief in Support of Petition at 11.  He's right:  The Court of Appeal first denied Williams the assistance of his appellate counsel in seeking to expand the record via habeas petition; it then rejected his second petition and his attempt to expand the record through consolidation with his direct appeal on the theory that the remedy by direct appeal was adequate; and, finally, it rejected his direct appeal because the record was inadequate.  The California Supreme Court then denied Williams's petition for review.  <u>People</u> v. <u>Williams</u>, No. S115477 (Cal. June 11, 2003).

With his direct appeal exhausted, Williams again tried to expand the record by filing a fourth habeas petition, but the Superior Court rejected it as "simply a variation on the basic claims that petitioner" had already made, and barred it as successive and untimely.  <u>In re Williams</u>, No. 04F06442 (Cal. Super. Ct. Sept. 7,

2004).  Williams presented the same petition to the Court of Appeal and the

California Supreme Court, but each summarily denied it.  In re Williams,

No. C047918 (Cal. Ct. App. Oct. 7, 2004); In re Williams, No. S128615 (Cal. Oct.

26, 2005).  At no point in the state-court proceedings was Williams accorded the

opportunity to take discovery and present evidence extrinsic to the trial record in

support of his IAC claim.

Williams's case is similar to Nunes v. Mueller, 350 F.3d 1045, 1055 (9th

Cir. 2003), where the court of appeals explained:  "With the state court having

purported to evaluate Nunes' [IAC] claim for sufficiency alone, it should not have

required Nunes to prove his claim without affording him an evidentiary hearing."

Likewise, here "the state court fact-finding was fundamentally flawed" because the

state court "granted no evidentiary hearing or other opportunity for [petitioner] to

develop his claim."  Hurles, 650 F.3d at 1311.  "Based on these flaws in the state

court's fact-finding process, we find the state court decision resulted in an

'unreasonable determination of the facts' and is not entitled to a presumption of

correctness under AEDPA."  Id. at 1314; cf. Winston v. Kelly, 592 F.3d 535,

555–56 (4th Cir. 2010) ("[W]hen a state court forecloses further development of

the factual record, it passes up the opportunity that exhaustion ensures.  If the

record ultimately proves to be incomplete, deference to the state court's judgment

would be inappropriate because judgment on a materially incomplete record is not

an adjudication on the merits for purposes of § 2254(d)." (internal citations

omitted)), <u>cert. denied</u>, 131 S. Ct. 127 (2010); <u>Wilson</u> v. <u>Workman</u>, 577 F.3d 1284,

1292 (10th Cir. 2009) (en banc) ("When the state court relies solely upon the

record evidence, and denies both the claim itself and an evidentiary hearing on the

proffered non-record evidence without any alternative holding based upon the

proffered evidence, there is no adjudication on the merits that would warrant

deferential review.").

 To be clear:  Williams overcomes the section 2254(d)(2) bar based on the

record that was before the state court when it adjudicated his case.  That is the

statutory requirement, as section 2254(d)(2) permits "federal postconviction

relief . . . only if the state . . . court's adjudication 'resulted in a decision that was

based on an unreasonable determination of the facts <u>in light of the evidence

presented in the State court proceeding</u>.'"  <u>Pinholster</u> v. <u>Ayers</u>, 590 F.3d 651, 666

(9th Cir. 2009) (en banc) (quoting 28 U.S.C. § 2254(d)(2), with emphasis added by

the court), <u>rev'd on other grounds</u>, <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. 1388 (2011).

Here, "the state court fact-finding process was fundamentally flawed" because it

"granted no evidentiary hearing or other opportunity for [Williams] to develop his

claim."  <u>Hurles</u>, 650 F.3d at 1311.  The Court of Appeal's IAC ruling was based on

the facts available in the record on appeal, which did not include the extensive

evidence Williams tried in vain to present to the state courts.

Because the state court's decision "was based on an unreasonable

determination of the facts," section 2254(d) does not preclude Williams's claim.

Section 2254(d) operates like a two-lane highway, with each lane guarded by a

tollbooth.  To pass through, a petitioner must demonstrate that the state court

adjudication either clashed with federal law (section 2254(d)(1)) or "was based on

an unreasonable determination of the facts" (section 2254(d)(2)).  Williams

qualifies for the latter.  The gate of one lane is thus opened, and 2254(d) poses no

further obstacle to Williams developing his claim in federal court.


**2.**  "[W]ith the state court having refused [Williams] an evidentiary hearing,

we need not of course defer to the state court's factual findings—if that is indeed

how those stated findings should be characterized—when they were made without

such a hearing."  Nunes, 350 F.3d at 1055.  Moreover, this court may permit

Williams, at long last, to expand the record to develop his IAC claim.  The warden

argues vigorously that, "no matter whether the challenge is to facts or law,

§ 2254(d) commands a federal court to confine itself to the past" and to avoid any

expansion of the record.  Objection to Consideration of Evidence at 2.  But, as

explained above, section 2254(d) confines a federal habeas court to the past only with respect to its assessment of whether the petitioner is barred by section 2254(d) itself.  Having determined that section 2254(d) does not bar Williams's claim, this court must consider his IAC claim based on whatever additional evidence he can present.  In short, because the state courts denied Williams an opportunity to develop the record to support his IAC claim, despite Williams's diligent efforts to do so, he is now entitled to present that evidence in support of his federal habeas petition.

The warden points to the Supreme Court's recent decision in Pinholster, 131 S. Ct. 1388, with which this court is well acquainted.  Pinholster held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Id. at 1398.  But Williams makes his challenge under section 2254(d)(2), not 2254(d)(1).  Pinholster isn't relevant where, as here, petitioner surmounts section 2254(d) because he was not allowed to develop the record in state court.  Pinholster had a full opportunity to develop the record in state court and may have been free to return yet again. Id. at 1412 (Breyer, J., concurring in part and dissenting in part).  Here, by contrast, "it would [be] futile for petitioner to return to the [state] courts," Williams v. Taylor, 529 U.S. 420, 444 (2000), because the state courts have made it perfectly clear they

will not grant Williams an opportunity to develop his IAC claim.

When Williams filed his fourth habeas petition, he proffered extensive extra-record materials, including his own declaration, the notes of his trial counsel, reports from counsel's investigator, Oliphant's statements to law enforcement and Pollard's statements to law enforcement.  Habeas Petition of Feb. 6, 2006.  The Superior Court rejected Williams's petition as blocked by the "Clark bar . . . for timeliness" and also "successive and [therefore] subject to the Clark bar," relying on In re Clark, 855 P.2d 729 (Cal. 1993).  In re Williams, No. 04F06442 (Cal. Super. Ct. Sept. 7, 2004).  Having rejected Williams's continuing efforts to expand the record as Clark-barred, the California courts have made it clear that Williams will not be allowed to develop his IAC claim in state court.  This case is thus much like that other Williams case in that "it would [be] futile for petitioner to return to the [state] courts."  529 U.S. at 444.

Section 2254(e)(2) precludes a federal habeas court from holding an evidentiary hearing "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings."  The Supreme Court has explained that, "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."  Id. at 432.  As explained

above, Williams was diligent; he repeatedly tried to expand the state court record

in support of his IAC claim, but was thwarted by a series of inconsistent rulings

from the state courts.  "In these circumstances, . . . petitioner cannot be said to have

failed to develop [his claim] in state court by reason of having neglected to pursue

remedies available under [state] law."  <u>Id.</u> at 444.

 The court therefore grants Williams's motion of November 28, 2011, for

expansion of the record and a paper evidentiary hearing.  An evidentiary hearing

with live testimony is not required by this circuit's precedent, which permits

relying on written exhibits to expand the record.  <u>See</u> <u>Downs</u> v. <u>Hoyt</u>, 232 F.3d

1031, 1041 (9th Cir. 2000).  Nonetheless, in its order of December 19, 2011, the

court gave both parties twenty-one days to request an evidentiary hearing with live

testimony.  Neither did so, and each has thus forfeited any right it may have had in

that regard.  This court now grants Williams's motion and admits into evidence the

five exhibits accompanying it.

 **3.**  Williams was a drug dealer.  Burglars broke into his house and stole

some of his drugs.  On the afternoon following the burglary, children found the

body of someone whom Williams could have suspected as a burglar, based on

confusion about a pager the burglars had left behind.  A Drug Enforcement

Administration informant who usually wore a wire tried unsuccessfully to get Williams to discuss the murder.  The informant testified at trial that, the following day, when he was <u>not</u> wearing a wire, Williams confessed to the murder.  Based on the informant's testimony, and a belt and rope found on the victim, Williams was convicted.

Williams's defense, as previewed by his counsel's opening statement, was that Williams spent the entire evening and night with Miyaka Oliphant, and part of the time with Michael "Freddy" Pollard as well.  According to the lawyer, Williams "wanted to go to the Walmart in Elk Grove.  He'd been there before.  And he'll be testifying in this case and a lot of this information will be coming from David Williams's own testimony."  Counsel continued:  "You'll hear from Miyaka Oliphant.  David said to Miyaka, let's go down to the Wal-Mart.  They get in the car and they proceed, start proceeding toward the Wal-Mart."  Counsel added, "You'll hear from Michael Pollard.  Michael, you want to go down to the Wal-Mart?  Okay, of course."  Transcript of Opening Statements at 11.  Who wouldn't?

On the way back from Walmart, Williams and Oliphant dropped off Pollard.  When they got back to Williams's house, they found it had been burglarized and the burglars had left behind a pager:  "David Williams will tell you, and Miyaka,

page 20

that they started calling people.  They wanted to know whose pager that was. . . .
And this phone calling continued on until the next day," when both Williams and
Oliphant awoke at his house.  So, "David Williams will testify, among other
witnesses, that where he was on Sunday evening, Wal-Mart, came back to the
house, made phone calls, stayed there.  Miyaka Oliphant was there . . . ."  <u>Id.</u>
at 14, 22.

 In addition to promising the jury it would hear Williams's alibi from
Williams, Oliphant and Pollard, counsel promised that Williams's testimony would
cast doubt on the prosecution's physical evidence.  A belt was found on the murder
victim that matched Williams's size, which was unusual:  He wore a 60-inch belt.
His counsel promised that "David Williams will testify.  Again, he'll testify that
what type of clothing—clothing he wore generally.  We are—we have pictures of
the belt and we have the actual belt.  We'll ask him if that's his belt and he says it's
not."  <u>Id.</u> at 22.

 Counsel also promised that Williams would explain that his relationship
with the prosecution's key witness, the informant Roland, was such as to cast
doubt on Roland's assertion that Williams confided in him about the murder:
"David Williams will tell you his relationship with Mike Roland is a business one.
He'll tell you how many contacts they had, whether he was allowed in the house,

what contacts he had with Mike Roland; that he went to the—to the gun store on Tuesday with—with Mike Roland, did not discuss anything about any murder or pistol-whipping anybody or anything in that regard."  Id. at 23.

Counsel concluded his opening statement by returning to the centrality of Williams's own testimony to his defense:  "In summary, David Williams will tell you and the evidence will also corroborate David Williams did not commit this crime, did not murder Mallory Treadwell, Junior, and is innocent of this charge." Id. at 24.

Neither Williams nor Oliphant nor Pollard testified.

A.  Williams

Williams had, in some conversations with his lawyer, expressed a desire to testify; he even momentarily took the stand at trial.  But Williams's counsel, better than anyone, should have known not to promise the jury that Williams would testify.  That's because, as the defense investigator's declaration relates, it was Williams's counsel who "made it clear that he thought Williams should not testify" and who "kept discussing the pitfalls and disadvantages of testifying."  MER, Exhibit J.  For Williams's counsel to promise the jury ten times that Williams would testify even as he was trying to persuade Williams not to do so was highly

unprofessional.  Ouber, 293 F.3d at 28–29.

Before trial, Williams's lawyer engaged in extensive and inconclusive conversations with the prosecutor and judge about the consequences of his client testifying.  Reporter's Transcript at 13–15, 20, 23, 29, 31–32, 34–35, 38, 47, 69–71, 99–100.  In pretrial proceedings, the trial judge referred to "[t]he concern your attorney has" with the possibility of Williams's testifying.  Id. at 13.  Counsel's concern was justified because the prosecution was eager, as it made clear at the same and subsequent pretrial proceedings, to impeach Williams with evidence of other crimes; plus anything Williams said might be admissible against him in pending state and federal drug and gun prosecutions.  Id. at 20, 29.  So, while Williams's counsel did at one point inform the court that Williams intended to testify, id. at 43–44, it clearly remained an unsettled issue, and the court continued to discuss with Williams the open question of "whether you testify," "[i]f you choose to testify" and "if you take the stand," id. at 70, 119.  Williams's counsel continued discussing with the court what types of impeachment Williams would face "if he chooses to take the stand."  Id. at 99.

After much back and forth on the issue, the trial judge explained to Williams:  "The other thing you could obviously do is just not take the stand if you and your counsel chose not to do that.  I'm not suggesting that tactically in this

case.  The option's for you.  I'm just explaining what could happen."  Williams

conferred with his counsel, who reported back to the court that "Mr. Williams is

showing some frustration here."  <u>Id.</u> at 121–22.  This uncertainty and consternation

provided the backdrop as the trial began.  It was at this point that Williams's

lawyer made his opening statement which consisted almost entirely of promises

that Williams, Oliphant and Pollard would testify.

 The discussions as to whether Williams would testify continued as the trial

progressed.  In the midst of the trial, out of the jury's presence, Williams's counsel

told the court that "I can tell you that I met with my client extensively . . . and

decisions were made yesterday, and it's Mr. Williams' decision at this time not to

testify."  <u>Id.</u> at 982–83.

 When the moment of truth arrived, his counsel said to the court:  "Let me

ask Mr. Williams, now that he's heard all your rulings . . . let me ask him what his

position is."  (It's worth noting that counsel had promised Williams's testimony

not only in the teeth of great uncertainty but also before hearing all of the court's

relevant rulings.)  The court then asked Williams whether he wanted to testify, and

he conferred with counsel.  He initially decided to do so but, after further

discussions with his lawyer, the trial judge and the prosecutor, he decided against

it.  <u>Id.</u> at 999, 1013–19.

By promising the jury that Williams would testify, and would do so as to specific facts, the lawyer raised certain expectations in the jurors' minds, expectations that would count heavily against Williams when they went unfulfilled.  The lawyer enumerated the various ways in which Williams would cast doubt on the government's case:  He would deny that he committed the crime, placing himself at a different location from where the victim was found; he would explain why the alleged confession to the professional informant wasn't credible; and he would deny that the belt was his.  While a defendant's denials are not the strongest evidence, the failure to make those denials, when the jury was promised that he would, left the strong inference that everything Williams failed to deny must, in fact, be true.

There is, of course, always a risk that the jury will hold the defendant's failure to testify against him, drawing the seductive inference that an innocent man would not hesitate to tell his side of the story.  We take stringent precautions against that risk by instructing the jury of the burden of proof, of defendant's right not to take the stand and of the jury's duty not to infer guilt from silence.  <u>See</u> <u>Carter</u> v. <u>Kentucky</u>, 450 U.S. 288 (1981).  By shining a light on Willams's failure to testify, counsel undermined the presumption of innocence and made it much harder for jurors not to hold defendant's silence against him.

Had the prosecutor called attention to Williams's failure to testify, he would clearly have violated Williams's Fifth Amendment privilege against incrimination. See Griffin v. California, 380 U.S. 609 (1965).  When a defendant's own lawyer causes jurors to wonder why he did not testify, this is a self-inflicted wound that's bound to undermine a defendant's presumption of innocence.  Confronted with a very similar case, the First Circuit noted as follows:

> It is apodictic that a defendant cannot be compelled to testify in a criminal case, see U.S. Const. amend. V, and criminal juries routinely are admonished—as was the jury here—not to draw an adverse inference from a defendant's failure to testify.  But the defendant has the right to testify in her own defense, and, when such testimony is proffered, the impact on the jury can hardly be overestimated.  When a jury is promised that it will hear the defendant's story from the defendant's own lips, and the defendant then reneges, common sense suggests that the course of trial may be profoundly altered.

Ouber, 293 F.3d at 28 (internal citation omitted).

Counsel's rash promise that Williams (and the other two witnesses) would testify seems to have been the consequence of a more fundamental problem, namely a failure to adequately prepare for trial.  As he stood before the jury and delivered an opening statement promising a defense consisting of the testimony of Williams, Oliphant and Pollard, counsel had never talked to the latter two at all. And counsel had never discussed with defendant his whereabouts at the time of the

murder or any other aspect of his promised testimony.  In his first amended

petition, Williams declares under penalty of perjury and without contradiction:

"At no point prior to May 24, 2001 [ten days after opening statements] did

[counsel] interview me as to my story or whereabouts on the night Mallory died.

Only [counsel's investigator] interviewed me.  The opening statement [counsel]

gave was based on what [the investigator] told him my story was."  First Amended

Petition at 18.

    This circuit has held that, "[t]o make an informed decision whether to

call . . . a witness at trial, [defendant's] attorney was obligated to make an

independent assessment of [the witness's] account . . . and credibility as a witness."

Howard v. Clark, 608 F.3d 563, 571 (9th Cir. 2010).  Howard specifically noted

the obligation to "attempt to interview" a key witness.  Id. (quoting Avila v.

Galaza, 297 F.3d 911, 920 (9th Cir. 2002)); see Lord v. Wood, 184 F.3d 1083,

1095 (9th Cir. 1999) (finding IAC for counsel's failure to interview personally

three key potential witnesses); Brown v. Myers, 137 F.3d 1154, 1156–58 (9th Cir.

1998) (finding IAC for counsel's failure to contact potential alibi witnesses).

    Clearly, defense counsel could have interviewed Williams about his story:

They spoke about other matters, and counsel's investigator apparently had no

trouble discussing the substance of the case with Williams.  MER, Exhibit J.  For

counsel to promise the testimony of <u>any</u> witness without speaking to the witness and determining whether the testimony would stand up on cross is bad enough. <u>See</u> pp. 30–32, 36–38 <u>infra</u>.  But for a lawyer to come to the day of trial without ever having discussed the substance of the case with his own client betrays a shocking degree of neglect on counsel's part.  For counsel to promise the jury time and again that his client would testify as to specific details that the lawyer had never discussed with the client can be explained only by a failure to meaningfully prepare for trial.  A man charged with murder and facing a life sentence is entitled to more.

### B.  Oliphant

In her uncontroverted declaration, Oliphant explains that she "was with [Williams] on the night that Mallory Treadwell was murdered."  She relates how she and Williams went to Walmart, then returned home to find his house burglarized, and began calling the numbers that appeared on a pager the burglars had left behind.  Eventually, Oliphant started cleaning up the mess the burglars had made, and "David watched me cleaning for a while before falling asleep in a large armchair.  After I finished cleaning up and putting the house back together, I woke David to come to bed with me."  MER, Exhibit K.

Oliphant, who had been with Williams the entire night of the murder, was stunned to learn he was a suspect: "When I heard that David was suspected of killing someone on the night we went to Walmart, I thought it was a joke." Subsequently, when she was no longer dating Williams, Oliphant was eager to avoid the controversy surrounding his trial. Nevertheless, after being summoned she "appeared in court that afternoon," then "went [to] the courthouse the next day. I waited outside the courtroom. I was never called to testify. I do not know why. After waiting around for a while, I was approached by somebody who told me I could go home because my testimony was not needed. I was ready and available, and would have told the jury that I was with David from midnight on the night in question until late the following morning or after, and that there is no way he could have been involved in the murder of Mallory Treadwell. It has bothered me for years that David was wrongly convicted of this crime and that I did not get the opportunity to let the jury know of my firsthand knowledge of his innocence." Id.

That Oliphant could and would provide this alibi was known to Williams's trial counsel, as he admits. MER, Exhibit I. His investigator's report on Oliphant explains that she and Williams went to Walmart, then spent the night at home. And the report further explains that, contrary to the story of the DEA informant that Williams had confessed to beating and strangling the victim in Williams's own

front yard, Oliphant recalled that "'[t]here was no commotion or anything at the house.  I would have known if something like that was going on.'"  The investigator remembers that Oliphant "was a very important witness," and that he "was surprised when I learned that she would not be testifying.  During my interaction with her during the trial, I don't recall her saying anything that contradicted her previous statements."  MER, Exhibit J.  Oliphant's statement to a sheriff's detective told the same basic story, First Amended Petition at 43–50, and another detective's recording of her conversation with Williams suggested the same, id. at 58.

Williams's trial counsel offers no explanation for promising the jury it would hear from Oliphant and then failing to call her to the stand:  "With regard to Miyaka Oliphant, I do not recall why I did not call her to testify. . . .  I would have seen that her initial statements to investigators and Mr. Gane [his private investigator] were months prior to the trial date. . . .  I don't at this point remember the colloquy with Mr. Williams or the actual decision or time of the decision to not call her."  MER, Exhibit I.  The court is aware of no strategy, and the warden has suggested none, that could have justified not calling Oliphant to the stand to tell her story.  Oliphant's story was entirely consistent with the defense's theory of the case, and it's hard to see how it could have done anything but help Williams.  Nor

has anyone suggested a strategic reason for promising the jury that Oliphant would testify and then failing to fulfill that promise.

Counsel's failure to focus on this crucial witness may well have been caused by the fact that he never interviewed Oliphant. First Amended Petition at 17. As discussed above, this circuit has held that defense counsel's failure to personally interview an available key witness qualifies as ineffective assistance of counsel. See p. 26 supra.

It was unprofessional for counsel to come to the day of the trial without having personally spoken to Oliphant to decide for himself, not only whether she would testify and what she would say, but also how she would come across to the jury. A witness may have a good story to tell, yet be left off the witness roster because experienced trial counsel determines that the witness would crumble on cross. Or, the witness may carry baggage that's more damaging to defendant's case than the testimony is helpful. Judgments such as these cannot be made based on statements given to the police or an investigator. Counsel, whose credibility is on the line with every witness he presents, must make a professional judgment that the witness will likely help his client's case.

A fortiori, counsel should not promise the jury the testimony of a witness he hasn't personally examined. A promise in the opening statement that a witness

will testify in a certain way is a pact between counsel and jury: He commits to present certain proof in exchange for the jury's implicit promise to keep an open mind until he has an opportunity to do so. Jurors take such commitments seriously and feel betrayed when the promise goes unfulfilled, especially if there's no explanation. For counsel to promise the testimony of a witness he has not himself interviewed is a risk a lawyer should not lightly undertake, never if there's any way to avoid it.

Oliphant was available for counsel to speak to before trial. He was aware of her significance, as he mentioned her in his opening statement, and explained exactly why she was important. Had counsel actually talked to Oliphant before trial, not only would he have had a sounder basis for promising her testimony to the jury, but he would have been far less likely to overlook the significance of her testimony and his promise to the jury that she'd testify.

The damage caused to defendant's case by counsel's failure to talk to Oliphant, and his unfulfilled promise to have her testify, is difficult to overstate. Counsel promised the jury a witness who was closely associated with the defendant, which made her absence that much more damaging. Her failure to show up not only deprived defendant of her very useful testimony; it also left the jurors to wonder why she was absent. They might well infer that she didn't testify

because she was unwilling to perjure herself to help defendant.  This could also suggest that counsel's promises that she would testify were part of an unsuccessful effort to pressure her to lie on the stand.  Aside from damaging defendant's case directly, this would also have undermined counsel's own credibility with the jury.

It's worth noting that the testimony Oliphant now says she would have offered is not a late invention; rather, she's told the same basic story all along. Oliphant was interviewed multiple times by the police, often in quite hostile fashion and without a lawyer, but she remained steadfast in her defense of Williams.  While slight variations are inevitable in a witness's story, her explanation of where Williams was the night of the murder and what he was doing has been unwavering.  This is what she told a detective on July 31, 1998, four days after the victim's body was discovered:

> We went to the Walmart down in Elk Grove. . . .  We ended up not buying anything at the store and got into a pretty loud argument. . . .  We went back to David's house without making any stops along the way.  When we got back there was still no one at the house. . . .  When we got back to the house, we just went to sleep.  We didn't talk at all, because of the argument.  David was sleeping in his bedroom and I slept on the couch in the living room.  I eventually went and got in bed with him, but by then it was almost daylight.  I'm guessing it was maybe 5:00 or 6:00, in the morning.  David sleeps real hard. . . .  I didn't wake up until I went and got in bed with him, but I would have heard him if he had left.  When he leaves, he uses the front

> door right in the living room.  He's a big guy, and I would
> hear him moving around if he were leaving. . . .  I woke up
> again about 10:30 or 11:00 that morning.  David was still
> asleep.  I think we stayed around the house all day on
> Monday.

First Amended Petition at 33–34.  The detective warned Oliphant that, if she were

lying, "she could be placing herself in some jeopardy," but "[s]he assured [him] . . .

that what she has told [him] is the truth."  Id. at 38.

On August 5, 1998, Oliphant signed a statement regarding a visit she paid

Williams a few days after the murder.  She explained that she brought two guns

and some marijuana into his house, which apparently got him into trouble as a

parole violation.  Nonetheless, she stood by her story, even as she recognized that

"I am incriminating myself but the truth is the truth."  Id. at 41.

On August 9, 1998, when Oliphant visited Williams in jail, another detective

took the opportunity to question her further.  Her story remained consistent:

> We were at Walmart like two hours to two and a half hours.
> We didn't buy nothing.  Me and David got into an
> argument. . . .  Then we went home [to] David's house.  We
> came straight home.  We didn't make no stops at all. . . .  I
> slept on the couch and he slept in his room.

Id. at 43–45.

When the detective claimed that "[w]e know you are not telling the truth

about you guys going in the house and going to sleep," Oliphant insisted:  "We did

go in the house and go to sleep." Id. at 45.  When asked whether she and Williams

killed someone, Oliphant replied:  "Oh come on, now.  First of all David is 350

pounds.  He can't murder nobody.  He was with me and we were at the same

house.  So somebody was there that killed somebody?  It wasn't us and it wasn't at

that house." Id. at 47.  And when the detective maintained that "David was not in

the bedroom all night long," Oliphant asserted:  "He had to be in that bedroom all

night long.  Because when I woke up before him.  He was still in bed." Id.

Oliphant also continued to take responsibility for what she'd brought to his house:

"He's not in jail for murder.  He's in jail for 'some drugs and stuff that I had in his

house'.  He ain't killed nobody." Id.

Oliphant's statements to the defense investigator in January 2001 told the

same story.  "She was very cooperative" and explained that, after going to

Walmart,

> she and David arrived back at his house around 2:30
> a.m. . . .  She thought David went into his own room and
> went to sleep.  Oliphant told police she woke up around
> five or six in the morning and went to David's room where
> she found him sleeping in his bed.  She currently recalls
> waking up and going into David's room, but she no longer
> recalls what time it was.  She believes it was still dark
> outside.  She climbed into bed with him, and the two of
> them did not get up until around 10 a.m. Monday morning
> when they both got out of bed together.

Id. at 64.  She added that, if someone had been pistol-whipped in Williams's yard, "I would have heard yelling.  I don't sleep that soundly.  The living room is in the front of the house, and I wouldn't have been that far from the tree in the front yard."  Id. at 65.

The story Oliphant says she would have told on the witness stand is not of late or dubious vintage.  It has been her story all along, despite repeated police interrogations.  But Williams's lawyer wouldn't have known just how steadfast she could be, because he never interviewed her.  Instead he promised the jury her testimony sight unseen, then broke that promise for no apparent reason.

It was incompetent for counsel not to personally interview a key witness before trial.  It was doubly incompetent for him to promise the jury the witness would testify without having talked to the witness.  And it was triply incompetent for counsel to fail to put on the stand an apparently solid witness who supported fully the defense theory of the case, after he promised the jury the witness would testify.

### C.  Pollard

Williams's counsel also promised the jury Pollard's testimony.  Pollard accompanied Williams and Oliphant on their foray to Walmart, so he could have

confirmed part of Williams's story.  But, as Pollard states in his uncontroverted

declaration, after being transported from prison (where he was serving an unrelated

sentence) to testify at Williams's trial, he "had no idea which side subpoenaed me

or why I was being called to testify.  No one working on David's behalf . . . had

ever been in contact with me."  When two individuals arrived to speak with him,

Pollard asked them to confirm that they really represented Williams.  Because they

failed to do so, he declined to speak with them.  MER, Exhibit L.  Still confused,

Pollard was called to the stand.  He initially indicated he would testify, then was

given a lawyer who advised him to invoke his privilege against self-incrimination

unless he was given immunity.  Pollard took the Fifth.  Reporter's Transcript at

986, 994; MER, Exhibit L.

Counsel's professional failures start with his failure to interview the

witness—or even have his investigator interview him—before deciding whether to

use him at trial.  See Howard, 608 F.3d at 570 (finding deficient defense counsel's

failure to interview a potential "star witness for the prosecution"); United States v.

Tucker, 716 F.2d 576, 583 (9th Cir. 1983) ("It is difficult to see how [counsel]

could make an informed assessment of the strengths and weaknesses of the

government's case without attempting to ascertain specifically what the testimony

of the government's witnesses would be. . . .  [Counsel]'s failure to interview these

witnesses, given the circumstances of the case, was clearly incompetent.").

In his recent declaration, counsel's investigator admits that "I did not interview him before the beginning of trial," then, with defense counsel, "met briefly with Mr. Pollard.  I did not prepare a report or a statement.  I have only a vague recollection of meeting Pollard at the jail and have no recollection of what he told us."  MER, Exhibit J.  The brief meeting to which the investigator refers occurred during the trial, <u>after</u> counsel had made his pledge to the jury.  And, as Williams states, "neither [counsel] nor [his investigator] interviewed Pollard before Opening Statements."  First Amended Petition at 17.  For counsel to promise the jury that it would hear from Pollard, when <u>no one</u> from the defense team had spoken to Pollard and found out whether he would testify or what he would say, was reckless.

Counsel does not explain his failure to resolve the question of whether Pollard would testify before trial, or why he promised the jury the testimony of a witness he should have known might well refuse to testify unless he was granted immunity.  Nor does counsel explain why he failed to determine before the trial started whether Pollard would take the Fifth, whether the prosecution would grant him immunity or whether his statement to the police would be admitted in lieu of his testimony.  These are the kinds of issues that competent counsel would seek to

resolve before trial so that he can make informed decisions in planning the defense

and preparing an opening statement.  Promising the jury Pollard's testimony and

then being caught flat-footed when Pollard refused to testify is yet another instance

of deficient trial preparation on counsel's part.

Pollard could have confirmed only part of Williams's alibi, and so it might

have been plausible for counsel to leave him off the witness list

altogether—provided he had interviewed the witness and determined that his

testimony was not helpful.  But there can be no justification—and none has been

offered—for promising the jury the testimony of a witness that no one from the

defense team had even spoken to.

**4.**  In marked contrast to counsel's opening statement, which consists largely

of promises of the exculpatory evidence he would present, his summation consists

entirely of trying to poke holes in the prosecution's case.  Either strategy may be

appropriate, depending on the case.  But priming the jury for the former and

delivering only the latter is a recipe for failure.

Consider just one issue in the case: the absence of anyone who heard what

must have been a loud altercation in Williams's front yard in the middle of the

night, when he supposedly confronted the victim, pistol-whipped him till he

screamed, tied him to a tree and strangled him to death.  The story about this supposed occurrence came from Michael Roland, the informant, who was not actually present but claimed that Williams had so described the scene to him.  The defense called five of Williams's neighbors to testify that they heard no "loud noises that evening" and that their dogs reacted to nothing.  Reporter's Transcript at 877; see also id. at 883, 893, 910–11, 919.

On its own, this testimony might have helped the defense's case, but in context it paled in comparison to that of a witness the jury had been told about but who did not testify: Williams's girlfriend, who had spent the night in Williams's own house, and thus was much closer to the supposed scene of the crime than anyone else.  The jurors might not have known that Williams's girlfriend spent the night in the house with him, had defense counsel not alluded to the fact.  They might not have wondered why she didn't testify, had defense counsel not promised them her testimony.  But the weaker testimony of the neighbors who were farther away must have underscored the absence of the girlfriend whom they expected to testify in support of Williams.

Sometimes, all that a defense lawyer can do is point to weaknesses in the prosecution's case.  Acquittals have certainly been gained that way.  But it's far harder to persuade a jury to acquit based on weaknesses in the prosecution's case

when the jury has been promised exculpatory testimony from percipient witnesses, including defendant himself.  The jury will draw negative inferences from the unexplained absence of the promised testimony, and these inferences will fill any gaps that might otherwise exist in the prosecution's case.

A number of circuits have held, in similar circumstances, that a lawyer's unfulfilled promise of key testimony qualifies as deficient performance under Strickland v. Washington, 466 U.S. 668 (1984).  For example, the First Circuit has held that "defense counsel's repeated vow that the jurors would hear what happened from the petitioner herself . . . in conjunction with his subsequent decision to advise the petitioner against testifying" was "indefensible" and deficient under Strickland.  Ouber, 293 F.3d at 27.  In Ouber, defense counsel promised testimony from the defendant; here, counsel promised not only defendant's testimony but also that of two other witnesses, making his performance even worse than in Ouber.

The First Circuit reached the same conclusion regarding a defense counsel's unfulfilled promise during an opening statement to present key expert psychiatric witnesses.  Anderson v. Butler, 858 F.2d 16 (1st Cir. 1988); see United States v. Gonzalez-Maldonado, 115 F.3d 9, 15 (1st Cir. 1997) ("A defendant's opening statement prepares the jury to hear his case.  If the defense fails to produce

promised expert testimony that is critical to the defense strategy, a danger arises that the jury will presume that the expert is unwilling to testify and the defense is flawed. . . .  As we did in <u>Anderson</u>, we find that promising to admit this important evidence and then failing to produce it is prejudicial as a matter of law in the circumstances of this case.").

The Seventh Circuit came out the same way in a case where defense counsel promised two key witnesses during opening argument; the court explained that, "[w]hen counsel failed to produce the witnesses to support this version, the jury likely concluded that counsel could not live up the claims made in the opening." <u>Harris</u> v. <u>Reed</u>, 894 F.2d 871, 879 (7th Cir. 1990).  The Seventh Circuit has also found ineffective assistance based on unfulfilled promises in defense counsel's opening statement that the defendant would testify:  "Making such promises and then abandoning them for reasons that were apparent at the time the promises were made cannot be described as legitimate trial strategy.  Promising a particular type of testimony creates an expectation in the minds of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility.  In no sense does it serve the defendant's interests."  <u>United States ex rel Hampton</u> v. <u>Leibach</u>, 347 F.3d 219, 259 (7th Cir. 2003) (footnote

omitted).

The Third Circuit agrees:  "The failure of counsel to produce evidence which

he promised the jury during his opening statement that he would produce is indeed

a damaging failure sufficient of itself to support a claim of ineffectiveness of

counsel."  <u>McAleese</u> v. <u>Mazurkiewicz</u>, 1 F.3d 159, 166 (3rd Cir. 1993).  Our

colleague in the Central District, Judge Feess, a highly respected former U.S.

Attorney, noted in <u>Madrigal</u> v. <u>Yates</u>, 662 F. Supp. 2d 1162, 1183 (C.D. Cal.

2009), that "there are no Ninth Circuit Court of Appeals cases directly addressing

the issue of ineffective assistance of counsel arising from a broken promise that

defendant will testify," then embraced the Seventh Circuit's decision in <u>Leibach</u>,

347 F.3d 219, and the First Circuit's decision in <u>Ouber</u>, 293 F.3d 19.

In addition to counsel's unfulfilled promises to the jury, there was another

indication of deficient performance here: failure to talk to key witnesses, including

asking his own client about his alibi, before trial, and promising the testimony of

one witness (Pollard) to whom no one from the defense team had talked, and as to

whom there were serious doubts he could be put on the stand at all.  <u>See</u> pp. 26–27

<u>supra</u>.  These multiple unexplained errors bespeak a lack of adequate preparation

for trial.  The court so finds.

**5.**  Williams thus demonstrates deficient performance under Strickland; he shows prejudice, too.  The First Circuit summed it up well:  "When a jury is promised that it will hear the defendant's story from the defendant's own lips, and the defendant then reneges, common sense suggests that the course of trial may be profoundly altered.  A broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made."  Ouber, 293 F.3d at 28.  The courts in Ouber, Anderson, Harris, Leibach and Madrigal all found prejudice under Strickland due to broken promises by defense counsel, and the failures in many of those cases were less serious than the broken promises here; none was more serious.

The unfulfilled promises made by Williams's counsel were prejudicial not only because of the magnitude of their harm but because of just how close a case this was.  As the trial judge remarked, "[T]he trial, in my opinion, was in the defense's favor all the way up to and into [closing] argument. . . .  We have circumstantial evidence . . . that can cut both ways, and it did in this case."  Reporter's Transcript at 1283–84.  The prosecution relied heavily on the testimony of a professional DEA informant who happened not to be wearing a wire when Williams allegedly confessed to this murder and who knew pending charges against him would be dismissed in exchange for his testimony against Williams.

Id. at 304, 351.  In closing argument, the prosecutor repeatedly relied on the informant's testimony to hold his story together, even as the prosecutor acknowledged that he was a questionable witness.  Id. at 1074 ("[T]here's obviously some question as to Mike Roland here."); id. ("What did Mike Roland tell the police officers or the DEA?"); id. at 1075 ("You recall Mike Roland said . . . ."); id. ("[Y]ou recall Mike Roland was told . . . ."); id. ("Now, Mike Roland knew that and he told the cops that; he told the DEA that."); id. at 1076 ("Now, Mike Roland's not making this stuff up . . . ."); id. ("Mike Roland's telling the officers . . . ."); id. ("Remember, Mike Roland said . . . ."); id. at 1077 ("More from Mike Roland."); id. (". . . Mike Roland told the officers that David Williams told him . . . ."); id. ("[H]ow would Michael Roland be able to make that up?"); id. ("Now, Michael Roland told the officers that David Williams told him . . . ."); id. at 1078 ("David Williams also told Michael Roland and Michael Roland told DEA . . . ."); id. ("How could Roland make this stuff up unless it came from David Williams' mouth?"); id. at 1102–03 ("[Y]ou may be asking yourself, why was this defendant talking to Michael Roland so freely?").

The jury had been promised that defendant would deny his confession to Roland and explain why Roland's testimony should not be believed.  They had also been promised that defendant would explain why the 60-inch belt found at the

crime scene was not his.  Failure to provide this promised testimony surely helped

the jurors set aside any doubt they might otherwise have had.

The prosecution presented no evidence that Williams and the victim were

seen together on the day of the crime or at any other time.  No one saw the crime;

no one heard a disturbance at the time and place when the crime was supposedly

committed.  There was no blood, hair, torn clothing or any other physical traces of

a beating and murder having been committed in Williams's front yard.  No one

reported that Williams had expressed any animus against Treadwell, or that they

had a dispute.  The closest the prosecution came was speculation that Williams

might have mistakenly suspected Treadwell of having been one of the burglars.

What held the prosecution's case from falling apart was the 60-inch belt and

the alleged confession proffered by Roland.  Defense counsel had promised that

Williams would contradict both these pieces of evidence but ultimately failed to

have him do so.  Defense counsel promised an alibi from someone who had spent

the night with Williams, but she never took the stand, even though she was

available and willing to support the defense.

But it is not the mere absence of Williams's, Oliphant's and Pollard's

testimony that prejudiced defendant.  After all, a defendant's own testimony is

suspect, as might well be his girlfriend's, and Pollard was not with Williams during

the whole time when he might have killed Treadwell.  It would be a close call whether mere failure to put these witnesses on the stand prejudiced Williams.

What fatally undermined Williams's defense were counsel's unfulfilled promises that these witnesses would testify.  As mentioned, the promise that Williams would testify and speak extensively about the circumstances of the case would have made it nearly impossible for the jurors to put out of their minds the fact that he did not testify.  This compromised Williams's right to be presumed innocent and his right to remain silent.  Such harm is inherently prejudicial.

Almost as damaging was the unfulfilled promise that Oliphant would testify.  Had the jurors not been made aware there was another person in the house with Williams when he was supposed to have killed Treadwell, they would have drawn no negative inference from Oliphant's failure to testify.  But when counsel promised her testimony, and she then didn't testify, that would make jurors wonder why she didn't.  After all, she was the person in closest proximity to Williams, present when he discovered the burglary and able to witness his reaction to it.  And, of course, she could have heard if anyone was being beaten and strangled in the front yard.  The jury would no doubt wonder why this person, who was personally aligned with Williams and present at the scene, did not come speak in his defense.  It was a bit like telling the jury that the defendant was home with

mother at the time of the crime, and having mom refuse to back up the story.

Pollard's testimony would not have been as useful as his absence was harmful.  As the third witness the lawyer promised the jury who didn't testify, his absence would have confirmed that even Williams's friends were abandoning him.

Much of what we know counsel did wrong suggests a more general lack of preparation, the precise effects of which are impossible to gauge.  Cf. United States v. Cronic, 466 U.S. 648 (1984).  Like the four-fifths of the iceberg that lie beneath the surface, the most serious harm to Williams's case may well have been from what counsel failed to do because he did not spend the time and effort necessary to prepare adequately.  That Williams was prejudiced by this lack of preparation is without a doubt.

The jury appears to have deliberated for a day and a half before rendering its verdict.  Id. at 1245–48.  The trial judge explained that "counsel had mentioned to me, afterwards, two of them, that a juror, I think foreperson, said that it kind of all fell together in [closing] argument.  He could see clarity in that in his mind, that one juror, when they were talking with him out in the hallway, that he didn't have it fixed in his mind."  Id. at 1284.  Every indication is that this one came down to the wire.  Effective assistance of counsel, rather than unfulfilled promises, might well have changed the outcome.

Under "<u>Strickland</u>, . . . to establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 534 (2003) (quoting <u>Strickland</u>, 466 U.S. at 694).  Applying this standard, the court finds that Williams was prejudiced by the patently ineffective assistance he received from his lawyer at trial.

\*          \*          \*

In his opening argument, Williams's trial counsel built his defense around a compelling alibi he promised the jury would hear from three key witnesses.  By his closing argument, it was clear that none would be testifying and that his defense had fallen apart.  As counsel related to the jury the same narrative he'd presented in opening argument, he explained:  "David Williams leaves.  Miyaka Oliphant, another person, they go to the Wal-Mart in Elk Grove."  But counsel had failed to lay a foundation for this basic assertion—that Williams went to Walmart with his girlfriend the night of the murder.  So, when the prosecutor objected—"I don't think there's any evidence that Miyaka Oliphant went"—defense counsel immediately withdrew his statement and apologized.  Reporter's Transcript

page 49

at 1128.  By the time the trial was over, counsel had given the jury no alibi, no

testimony, no evidence—just broken promises.  And he reminded the jury of his

broken promises by alluding to the same story in summation—and gave the

prosecution an opportunity to point out that there was no proof to support defense

counsel's tale.  The Constitution demands more.


      **PETITION CONDITIONALLY GRANTED.**  Williams is ordered

released unless the state of California notifies this court within thirty days of the

filing of this order that it intends to retry Williams, and actually commences

Williams's retrial within ninety days.


March 19, 2012


 

**ALEX KOZINSKI**
Chief Circuit Judge
Sitting by designation